[4]  The utmost that could be claimed for section 2188 of the Penal Law would be that it conferred judicial discretion to sentence.

"While judicial discretion is a phrase of great latitude, it never means the arbitrary will of the judge. * * * It is a legal discretion, founded upon conditions which call for judicial action, as distinguished from mere individual or personal view or desire."   Matter of Superintendent of Bank, 207 N. Y. 11, 15, 100 N. E. 428, 429.

I hold the detention of the defendant in this case to be illegal, and the information, warrant, and commitment under which he is held void.   The relator is discharged.

Relator discharged.

## MILLS POWER CO. v. MOHAWK HYDRO-ELECTRIC CO.

(Supreme Court, Appellate Division, Third Department.   March 5, 1913.)

1. WATERS AND WATER COURSES (§ 171*)—RIPARIAN RIGHTS.

The water rights of a riparian owner consist in the right to have the natural flow of the water not unreasonably diminished in quantity or sensibly impaired in quality by upper owners; but the right not to be flooded by the act of another inheres in the ownership of land, whether riparian or not, and is not a riparian right.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 216–222; Dec. Dig. § 171.*]

2. WATERS AND WATER COURSES (§ 156*)—CONVEYANCES OF RIPARIAN RIGHTS—CONSTRUCTION.

When a riparian owner retaining his title to land conveys all the water rights thereto belonging, he surrenders his right to the natural flow of water, and clearly contemplates a partial or complete diversion thereof at some point upon the stream above his property; but a release of the right not to be flooded is not included in a grant of water rights, unless expressly conveyed.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 158, 174–183; Dec. Dig. § 156.*]

3. EVIDENCE (§ 451*)—PAROL EVIDENCE—PATENT AMBIGUITY.

The rule that a patent ambiguity cannot be helped by extrinsic evidence applies in the sense that a nonexistent mental intent as to subject, object, and terms cannot be supplied, or where the clear meaning of the words used establishes an indefinite intention.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2085–2092; Dec. Dig. § 451.*]

4. EVIDENCE (§ 455*)—PAROL EVIDENCE AFFECTING WRITINGS.

The rule that the clear meaning of a written instrument cannot be contradicted or explained by parol evidence permits words, which are mere signs setting in motion a thought in the mind of one which was in the mind of another, to be inquired into in the light of their special use and sense where there exists a definite intention as to the subject, object, and terms; such inquiry being not to dispute, but to provide a meaning.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2104; Dec. Dig. § 455.*]

5. WATERS AND WATER COURSES (§ 156*)—CONVEYANCE OF RIGHTS—CONSTRUCTION.

An owner of land on the side of a creek and of a farm further downstream, of such elevation that no line of pipe across it could convey water from a dam built on or below the land, unless it was 165 feet high

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and 2,000 feet long, conveyed all his water rights in the creek, together with the right of raising the water therein to its banks, and the right to build a dam across it without interfering with or injuring his buildings and the right to conduct the waters from the dam over his land to a grantee who had previously obtained nearly all the water rights along the creek from above the land to a point 20 miles below at a time when a pipe line course had been surveyed out, beginning above the land, and at the same time granted to the same purchaser the right to conduct the pipe line across the farm. *Held,* in view of the extrinsic evidence, that the words used conveyed a right to construct a pipe line from any dam built upon the creek at any point, including a pipe line across the land from a dam above to a power house below.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 158, 174–183; Dec. Dig. § 156.*]

Appeal from Trial Term, Fulton County.

Action by the Mills Power Company against the Mohawk Hydro-Electric Company. Judgment for defendant, and plaintiff appeals. Affirmed.

See, also, 143 App. Div. 890, 128 N. Y. Supp. 810.

The following is the opinion of Kellogg, J., at Trial Term:

There was conveyed to grantors of the defendant on the 3d day of June, 1908, certain rights in the language following: "All of the water rights and water privileges in and to the waters of Garoga creek as the same flows on and over the lands described in a certain warranty deed received by the parties of the first part from Cornell Leavitt and Annie Leavitt, his wife, dated October 10, 1904, together with the right of raising the said waters to the banks of said Garoga creek; also the right to build and erect a dam upon and across the said creek, but without interfering with or injuring the buildings of the said parties of the first part, and also the right to lead and conduct the waters from the said dam over the premises of the parties of the first part herein, the said land over which said creek flows being situate in the town of Ephratah, Fulton county, state of New York."

The original grantor of these rights, was the owner of the lands mentioned in the description. They consisted of 10½ acres of land on the east side of Garoga creek. In February, 1910, Henry Prime conveyed the same to parties through whom title thereto came to the plaintiff. The defendant erected a dam 60 feet high across the creek at a point upstream about a mile north of this parcel of land, and set up a line of pipe 78 inches in diameter, from the dam to its power house one mile below such land, crossing the same, for the purpose of carrying water and obtaining a head for power. The plaintiff contends that, under its deed, the defendant had a right to conduct water from a dam to be erected on the 10½-acre piece only.

[1, 2] The water rights and water privileges of a riparian owner are chiefly comprehended in the right to have the same come down in a natural flow not unreasonably diminished in quantity or sensibly impaired in quality by the uses of upper owners. When a riparian owner retaining his title to land conveys all the water rights thereto belonging, he surrenders his right to have the water thus come down, and clearly contemplates a partial or complete diversion thereof at some point upon the stream above his property.

The right not to be flooded by the act of another inheres in the ownership of all land whether riparian or not, and forms no part of the water rights of land bordering upon water. A release from such a right is clearly not included in a grant of water rights but must be expressly conveyed. He who conveys it must contemplate a flooding from a barrier erected in the stream at or below his own property.

Henry Prime made conveyance of all his water rights and also of a right to flood, but not higher than the banks of the stream. It would seem to follow that he had in mind the erection of a dam upstream and a diversion

of water, and the erection of a dam downstream and a flooding. He also in express terms conveyed the right to build and erect a dam upon and across the creek. This grant was coupled with the condition that it should not interfere with or injure the buildings upon his land. If this provision stood alone, it might well be construed to convey a right to build a dam only at or downstream from the land owned by him, for by its erection at no other point could a dam injure the buildings thereupon. In view of the provisions of the deed already mentioned, however, it would not be a construction repugnant to the meaning of this clause, were it held that the grantor intended a conveyance of a right to erect a dam upstream or downstream as the grantee chose; the right to a dam downstream being limited by a condition relating to its height. It is clear that a case is presented where a just construction would be assisted by a knowledge of the facts surrounding the making of the deed.

[3, 4] It has been said, after the pattern of Lord Bacon, times without number that "a patent ambiguity" cannot be "holpen" by evidence "extrinsical." It has been said an equal number of times that the clear meaning of a written instrument cannot be contradicted or explained by parol evidence. The explanation of these pronouncements, the apparent effect of which would be to exclude the use of all parol evidence in the interpretation of a written instrument, lies in the distinction not often noted between the intention of a grantor and the meaning or sense of his words. An intention resides in the mind; words do not contain it or embody it; neither do they carry it or transport it as from the mind of "A" to the mind of "B." They are mere signs by which there is set in motion that thought in the mind of "B" which was in the mind of "A." The mental intent as to subject, object, and terms of a gift can never be supplied where it did not exist. If the words of an instrument clearly show an indefinite purpose on the part of its maker, parol proof cannot define it. In this sense a "patent ambiguity" can never be helped. As if "A" gave "one of his houses" to "one of his sons," there is indicated by clear words an absence of definite intent in the mind of the giver concerning subject and object. Words, however, may be used in a general or special sense, according to the general habit of the public, or the special habit of the user. They may have a particular meaning according to the particular circumstance of their use. It is the particular sense in the particular case of the particular user which is important, for it is not the intention of the public but of the giver which matters. He may give to his son "John" having only a son "James" and by the former according to his peculiar habit mean the latter. He may give "his farm" having two. If he said "one of my farms," it would be ineffective because he makes no choice between the two; the existence of both being recognized. Nevertheless "my farm" may under the circumstances take on the meaning of a particular farm. Always the special use and sense of words may be inquired into. If there exists a definite intention as to subject, object, and terms of giving, and word signs are used for its expression which, though in themselves obscure, in the light of a special habit on the part of the user or the special circumstance of their use, clearly determine in the mind of the reader the thought of the writer the instrument is an effective writing for the purpose. It is not to dispute a clear meaning, but to provide one that the special use or circumstance is inquired into. In the statement that "Where the clear meaning of words establish a doubt in mental purpose extrinsic proof cannot be used" the two rules against the resort to such proof (1) in the case of a clear meaning, and (2) in the case of a clear ambiguity are rendered reconcilable.

In the case of Petrie v. Trustees of Hamilton College, 158 N. Y. 458, 53 N. E. 216, a particular use made of words employed in the negotiations for a conveyance of water rights was considered and held to control the meaning of the same words in the deed, though having a tendency to contradict their apparent meaning. The instrument conveyed "the waters of Kirkland Glen Brook." There were two brooks upon the grantor's land which had no name. The grantee in the colloquy before the grant said he would

name both streams "Kirkland Glen Brook." The deed was held to convey the waters of both brooks, instead of one as expressed in the deed.

[5] In the case before me these circumstances attended the grant: Mortimer Everest, the grantee, had previously to receiving it obtained nearly all the water rights along Garoga creek from above the land of the grantor (the ten and one-half acre piece) down to the Mohawk river 20 miles distant. In April, 1898, two months before the grant was made, a pipe line course was surveyed out which began at about the site of the present dam, ended at the location of the present power house, and passed by the 10-acre piece a short distance to the east thereof. Brush was cut and stakes driven at frequent intervals along the line. Of this survey Henry Prime, the grantor, must have been well aware. He owned also a farm below the 10-acre piece. On the very day and at the very time he granted the water rights in question he made a contract with Mortimer Everest giving him the right to conduct the pipe line across such farm. Now, such was the elevation of the Prime farm above the 10-acre piece that no line of pipe across it could convey water from a dam built on or below the 10-acre piece, unless the height of the structure was 165 feet, and its length 2,000 feet. Such a dam would raise the waters of Garoga creek above its banks, and flood the buildings upon the 10-acre piece, to which under the terms of the grant in question no injury might be done by the erection of a dam.

This evidence does not contradict the plain meaning of the grant. It enlarges the horizon of the interpreter. From believing that he is dealing with an ordinary case of a small power dam to impound water between the banks of a stream and immediately to return it to the stream at the dam, he finds that he may be considering a case where a great reservoir and the complete diversion of the water of a stream for miles of distance are contemplated. The opening words of the description immediately take on great significance. "All the water rights" is seen to be not an unnecessarily comprehensive expression, but one which in its widest sense, including therein the complete diversion of every ounce of water in the stream, was advisedly and deliberately employed. When the grant is construed in the light of the facts so proven, that at the time a pipe line two miles long had been staked upon the ground having its termini one above and one below the 10-acre piece, that the grantor at the time he conveyed the right to conduct water across such piece, also conveyed the right to lead the same across his farm below, a thing impossible where the water taken from a dam upon the 10-acre piece or below without enormous expense and without doing an injury prohibited, it is entirely clear that the words of the deed are used to convey a right to construct a pipe line from any dam built upon the stream at any point including a pipe line across the 10-acre piece leading from a dam above to a power house below as the same is now installed.

For all these reasons, the complaint is dismissed with costs.

Countryman, Nellis & Du Bois, of Albany (Andrew J. Nellis, of Albany, of counsel), for appellant.

Fred Linus Carroll, of Johnstown, for respondent.

PER CURIAM. Judgment unanimously affirmed, with costs, on the opinion of Justice Henry T. Kellogg at Trial Term.